939 So.2d 849 (2006)
Lisa Godin ROMANS, Appellant
v.
William Ryan FULGHAM, Appellee.
No. 2005-CA-00873-COA.
Court of Appeals of Mississippi.
October 10, 2006.
*851 Merrill K. Nordstrom, attorney for appellant.
Carrie A. Jourdan, attorney for appellee.
EN BANC.
BARNES, J., for the Court.
¶ 1. In May of 1997, William Ryan Fulgham was adjudicated the natural father of A.F., a child born out of wedlock to Lisa Godin Romans on November 28, 1996. The paternity judgment, issued by the Chancery Court of Lafayette County, ordered Ryan to pay to Lisa $100 per month in child support, but was silent as to custody. From the time of her birth until the outcome of the custody proceeding at issue in this case, A.F. lived primarily with her mother, though Ryan was allowed reasonable visitation. In September 2004, Ryan filed a petition in the Chancery Court of Lafayette County seeking primary physical custody of A.F. After a bench trial, the chancellor awarded Ryan primary physical custody of A.F., and awarded joint legal custody to both parents. Lisa changed counsel shortly after the chancellor's bench ruling, but before written judgment was entered. Her new counsel then argued the paternity order should be considered an initial custody determination. Notably, at no time during the hearing or closing argument did Lisa's original counsel argue that the Albright factors should not be used. On appeal, Lisa claims that the chancellor erred in treating the dispute as an initial custody determination, rather than as a custody modification proceeding; in the alternative, she claims that the chancellor erred in his application of the Albright factors. Finding that the chancellor appropriately treated the dispute as an initial custody determination, and that the chancellor's ruling was supported by substantial, credible evidence, we affirm the ruling of the chancery court.

ISSUES AND ANALYSIS
I. WHETHER THE CHANCELLOR ERRED IN TREATING THE DISPUTE AS AN INITIAL CUSTODY DETERMINATION.
II. WHETHER THE CHANCELLOR ERRED IN APPLYING THE ALBRIGHT FACTORS.
¶ 2. "In child custody matters, review by this Court is `quite limited in that the Chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse.'" In re Custody of M.A.G., 859 So.2d 1001, 1004(¶ 8) (Miss.2003) (quoting M.C.M.J. v. C.E.J., 715 So.2d 774, 776(¶ 10) (Miss.1998)). Where a chancellor has applied the correct legal standard and made findings of fact which are supported by substantial evidence, this Court will not reverse that decision. Id.
¶ 3. In original custody determinations, the "polestar consideration" is the best interest and the welfare of a minor child. See, e.g., Brekeen v. Brekeen, 880 So.2d 280, 283(¶ 5) (Miss.2004); Carr v. Carr, 480 So.2d 1120, 1123 (Miss.1985). Factors to be considered in ascertaining a minor child's best interests include (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) who has the best parenting skills and who has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; and (10) *852 stability of the home environment and employment of each parent and other factors relevant to the parent-child relationship. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
¶ 4. While a chancellor must take the Albright factors into consideration in a custody modification proceeding as well, the movant carries a heavier burden in a modification proceeding. In order to prevail in such a dispute, the complaining parent must show "that an application of the Albright factors reveals that there has been a material change in those circumstances which has an adverse effect on the child, and a modification of custody would be in the child's best interest, considering the totality of the circumstances." Jones v. Jones, 878 So.2d 1061, 1065(¶ 11) (Miss. Ct.App.2004). In Law v. Page, 618 So.2d 96 (Miss.1993), the Mississippi Supreme Court stated that the appropriate legal standard to apply in custody actions dealing with an illegitimate child, when there has been no prior custody determination, is that found in divorce proceedings, which is the best interest of the child considering the Albright factors. Id. at 101. Our Court has followed this custody standard in several instances. See C.W.L. v. R.A., 919 So.2d 267, 271(¶ 10) (Miss.Ct.App. 2005); S.B. v. L.W., 793 So.2d 656 (Miss. Ct.App.2001). In S.B. we held that when a father petitioned for paternity and custody at the same time, it was deemed an initial custody determination, because custody of the child had not been previously determined by the judiciary. S.B., 793 So.2d at 658(¶ 7). If custody had been determined previously, the proceedings would have been considered a modification of custody and the well-settled "material change in circumstances" standard would apply. C.W.L., 919 So.2d at 271 (¶ 10) (citing Law, 618 So.2d at 101).
¶ 5. In our case, claiming that an initial custody determination was made as part of the 1997 judgment finding Ryan to be the natural father of A.F., Lisa argues that this matter should have been treated as a custody modification proceeding rather than an initial determination of custody. While Lisa concedes that the paternity judgment did not explicitly award her primary physical custody of A.F., she argues that, by ordering Ryan to pay her $100 per month in child support, the chancery court implicitly awarded her primary physical custody of A.F. We do not find this argument persuasive. As an initial matter, we note that Lisa was not a party to the original paternity action. Rather, the action was initiated by the Mississippi Department of Human Services pursuant to its statutory authority to commence paternity actions. See Miss.Code Ann. § 43-19-31(b) (Rev.2004). The Department of Human Services's enabling act contains no language even authorizing it to initiate custody proceedings. Furthermore, the order not only failed to award Lisa custody; it never mentioned "custody" or referred to a "custodial parent."
¶ 6. While the Mississippi Supreme Court has noted that custody issues are routinely decided in paternity actions, it has also recognized that "a paternity action is not the most convenient or appropriate forum for determining the best interests of the child where custody actions are arranged to effectively and exhaustively address the issue." Griffith v. Pell, 881 So.2d 184, 187-88(¶ 12) (Miss.2004). Nothing in the record suggests that matters of custody were ever considered as part of the paternity proceedings, and Lisa has not provided this court with a transcript of the paternity hearing. Therefore, even were this Court to accept Lisa's theory that the paternity judgment implicitly awarded her primary physical custody of A.F., we see nothing in the record before *853 us indicating that the Albright factors were employed by the court during the paternity proceeding. Looking to these facts, we find that the chancellor properly categorized the custody proceeding as an initial determination, rather than as a modification proceeding.
¶ 7. We decline to find error in the trial court and adopt an argument that was not properly presented below. The contention that the paternity judgment was an initial custody determination was not raised at the chancery court level until after the chancellor had issued his bench opinion. In fact, Lisa's original counsel, during his closing argument, merely urged the chancellor to study the totality of the Albright factors in reaching his decision. In keeping with the holdings of Law v. Page, C.W.L. v. R.A., and S.B. v. L.W., the chancery court denied the motion to reconsider, thereby confirming the chancellor's decision that the issue should be treated as an initial determination, rather than a modification of custody. The dissent would have us distinguish the instant case from these cases on the basis that Ryan, the noncustodial parent, did not file his petition for custody in a timely manner. We find nothing in Law, C.W.L., or S.B. which would allow us to make this distinction; there is no indication that the timing of the custody proceeding was a dispositive factor in these decisions. Moreover, the dissent fails to articulate exactly how much time must pass, after the birth of the child, or an order of support, before a custody petition would be considered untimely. Finally, in neither Lisa's motion to reconsider the bench opinion, nor either party's brief to this Court, is the argument made that Ryan has waived his entitlement to an Albright analysis by virtue of his delay in bringing the custody proceeding. Thus, we find this case is not an appropriate vehicle to alter the law in this area. We maintain the appropriate standard is one of an initial custody proceeding utilizing an Albright analysis in order to determine the best interest of the child.
¶ 8. In reaching his decision to award primary physical custody of A.F. to Ryan, the chancellor made extensive findings on the record with regard to each of the Albright factors. In summary, the chancellor found the following:
(1) Age, health and sex of the child
¶ 9. The chancellor found that this factor weighed evenly for Lisa and Ryan, as A.F. was in good health, and not of tender years.
(2) A determination of the parent that has had the continuity of care of A.F.
¶ 10. The chancellor found this factor to weigh in favor of Lisa, as she had provided primary care for A.F. since her birth.
(3) Who has the best parenting skills and which has the willingness and capacity to provide primary child care
¶ 11. The chancellor found Ryan to have the better parenting skills, though he noted that the decision was a "close call." The chancellor cited testimony showing that Ryan had taken an active role in assisting A.F. with her school work, had done more to promote good health and hygiene on A.F.'s part, spent "one-on-one" time with her, and involved the child in church. In regard to willingness and capacity to care, the chancellor found that Lisa and Ryan were equally willing to care for A.F. However, the chancellor found that Ryan had a slight edge as far as his capacity to care for A.F. was concerned.
(4) The employment of the parent and responsibilities of that employment
¶ 12. The chancellor found that this factor weighed in favor of Ryan. The chancellor expressed concern at Lisa's unstable employment history, and noted that Ryan *854 had held a position in a family-owned business for most of his life.
(5) Physical and mental health and age of the parents
¶ 13. The chancellor found that this factor weighed evenly for Lisa and Ryan, as they were of similar age and were both in good health.
(6) Emotional ties of parent and child
¶ 14. The chancellor found this factor to weigh in favor of Ryan, citing testimony that A.F. was a "daddy's girl," that she would cry when leaving Ryan's house to return to her mother's house, and that Ryan and A.F. engaged in many activities together.
(7) Moral fitness of the parents
¶ 15. The chancellor found this factor to weigh in favor of Ryan, pointing to the fact that Lisa had given birth to three children out of wedlock, all with different fathers. The chancellor also noted testimony that Ryan had appeared to have learned from his past mistakes and had turned his life around significantly.
(8) The home, school and community record of the child
¶ 16. The chancellor found that this factor weighed in favor of Ryan as well. In support of this finding, the chancellor noted that A.F. had struggled with her studies while in Lisa's care, and that A.F.'s grades improved dramatically once Ryan began to actively involve himself in her academic affairs.
(9) The preference of the child at the age sufficient to express a preference by law
¶ 17. The chancellor found this factor inapplicable since A.F. was not of age to express a preference.
(10) Stability of home environment and employment of each parent and other factors relevant to the parent-child relationship
¶ 18. The chancellor found this factor to weigh in Ryan's favor, pointing to the fact that Lisa had moved a great number of times since A.F.'s birth, that Ryan's wife had become a "stay-at-home mom" able to look after A.F. during the day, and that Ryan had a large number of family members in the immediate vicinity of his home.
¶ 19. It is clear from the record that the chancellor thoroughly considered all of the Albright factors in making his determination that it was in A.F.'s best interest to be in the primary physical custody of Ryan. Lisa claims that the chancellor erred in ruling in favor of Ryan as to several of the factors; however, we are not at liberty to reverse a chancellor's ruling as to child custody matters unless we find that ruling to be clearly erroneous. See In re Custody of M.A.G., 859 So.2d at 1004(¶ 8). We find that the chancellor's decision in this case is supported by substantial, credible evidence; accordingly, we must affirm the ruling of the chancery court. Lisa's argument is without merit.
¶ 20. THE JUDGMENT OF THE CHANCERY COURT OF LAFAYETTE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK AND CHANDLER, JJ. ROBERTS, J., NOT PARTICIPATING.
GRIFFIS, J., Dissenting:
¶ 21. With much respect for the majority, I disagree and dissent.
¶ 22. First, I address whether we may consider this issue. The majority holds that the consideration of this issue is procedurally barred because it was not raised *855 before the chancellor. Ryan Fulgham's petition for custody attached as an exhibit the "Agreed Judgment Determining Paternity and Other Relief," executed by the chancellor on May 23, 1997.[1] Lisa Romans answered the petition and asserted that she has custody of the child. At the trial, during closing argument, Lisa's attorney argued that she was the "fit and proper parent to have the continued custody on behalf of" A.F. (emphasis added).
¶ 23. According to the transcript, the legal standard to be applied was first mentioned in the chancellor's ruling from the bench. There was no objection asserted as the chancellor made his ruling.[2] After the oral opinion but prior to the entry of a final judgment, Lisa's motion to reconsider was filed. I am of the opinion that the issue before the chancellor was whether custody should be modified or changed from Lisa to Ryan, and the chancellor was given an adequate opportunity to apply the correct legal standard but did not. Thus, I would not apply the procedural bar to our consideration of this issue.
¶ 24. Second, I discuss the appropriate standard of review, i.e., initial custody determination versus modification.
¶ 25. This case presents us with a difficult question that is unique to the relationship between the unmarried parents of extramarital children. The difficulty arises due to the involvement of DHS in the determination of paternity and our consideration of the future legal relationship between the parents, the child and the state. I am of the opinion that the chancellor applied an erroneous legal standard when he treated Ryan Fulgham's petition for custody as an initial custody determination. The chancellor should have treated this case as a modification of child custody, and therefore, Ryan should have been held to a higher evidentiary standard.
¶ 26. I concede that the majority has followed a recent decision by this Court. C.W.L. v. R.A., 919 So.2d 267 (Miss.Ct. App.2005). However, after consideration of the cases that support that decision, I am of the opinion that we applied an incorrect standard of review in C.W.L.
¶ 27. In C.W.L., Carol Ladner and Robert Anderson engaged in sexual relations that resulted in a daughter, Angel, born out of wedlock. Id. at 269(¶ 3). When the child was one-year old, Ladner filed a paternity action through the Department of Human Services against Anderson. Id. at (¶ 4). In May of 1997, the chancellor ruled that Anderson was the child's father and ordered child support and visitation. Id.
¶ 28. Sometime thereafter, Ladner and Anderson began to live together. Id. at 270(¶ 5). When Ladner moved out again, Anderson sued for custody. Id. Ladner argued that "the May 1997 paternity order awarded her de facto custody of Angel, and as such, Anderson should have been required to prove the material change in circumstances standard used in custody modification proceedings." Id. at 270-71(¶ 9). We rejected Ladner's argument. Id. at 271 (¶¶ 10-11). We reasoned:
The law is well-settled that "the material changes standard used in modification proceedings is dependent on there being a prior determination of custody." Law *856 v. Page, 618 So.2d 96, 101 (Miss.1993). However, where there has been no prior determination of custody, "the proper standard of law to be applied is that found in divorce proceedings, which is the best interest of the minor child." Id. (citing Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983)). Additionally, "in custody [matters] involving an illegitimate child, when the father acknowledges the child as his own, the father is deemed on equal footing with the mother as to parental and custodial rights to the child." Id. (citing Smith v. Watson, 425 So.2d 1030, 1033 (Miss.1983)).
A review of the record reveals that the chancellor, relying on S.B. v. L.W., 793 So.2d 656 (Miss.Ct.App.2001), found that because custody of Angel had never been judicially determined, the material-change-in-circumstances standard did not apply. We agree with the chancellor's findings. The paternity order failed to expressly award custody of Angel to Ladner. Further, there is no additional evidence in the record to suggest that a determination of custody had ever been made prior to the custody hearing. As a result, we find that the chancellor applied the correct legal standard and properly considered the case as one for initial custody. Therefore, this issue is without merit.
Id.
¶ 29. In C.W.L., we gave little if any consideration to the effect of the prior court's paternity order. I am of the opinion that our analysis of Law and S.B. was incorrect and that these cases did not support the decision to apply the original custody determination after a paternity order had been entered by the chancellor.
¶ 30. In Law v. Page, 618 So.2d 96 (Miss.1993), the Mississippi Supreme Court considered a similar factual scenario. On September 10, 1988, Jason John Page was born to Tylena Law and Perry Jack Page, who were not married. Id. at 97. After a blood test identified Page as the father, he filed a petition to establish paternity in June of 1989. Id. The trial was held in November of 1989, and the chancellor granted Page's petition for custody. Id. On appeal, Law argued that the chancellor erred when he used the wrong standard of review. Id. at 101. The chancellor weighed the Albright factors and granted Page custody based on what he determined to be the best interest of the child. Id. Thus, as in the instant case, the chancellor applied the standard for an initial custody determination instead of the higher evidentiary standard required in a modification of child custody determination. The court held:
Tena argues that the appropriate standard of law to be applied in the present case is that used in child modification proceedings. This contention, however, is misplaced. The "material changes" standard used in modification proceedings is dependent on there being a prior determination of custody. Such is not the case here since there has been no prior custody determination. Therefore the proper standard of law to be applied is that found in divorce proceedings, which is the best interest of the minor child. See Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983). In Smith v. Watson, 425 So.2d 1030 (Miss. 1983), this Court stated that in custody dealings involving an illegitimate child, when a father acknowledges the child as his own, the father is deemed on equal footing with the mother as to parental and custodial rights to that child. Id. at 1033.
Id. (emphasis added).
¶ 31. Thus, Law held that the question of whether the chancellor should apply the initial custody standard or the modification *857 of custody standard is decided based on whether there was a "prior determination of custody." Id. It follows that if there was never such a determination then an original Albright analysis should be applied. Id. If there was such a prior determination then the modification standard should be applied.
¶ 32. To apply Law to the instant case and C.W.L., we must note that, in Law, the child's father sought custody immediately, or certainly within a reasonable time, after paternity was established and his legal relationship as the child's father began. The child was born in September of 1988, and within ten months, his father (Page) petitioned the court to establish paternity and custody. Id. at 97. The court acknowledged that the child remained in the mother's custody from birth but held that there was no prior determination of custody. Id. at 97, 101.
¶ 33. What distinguishes Law from both the present case and C.W.L., is that in Law the father immediately sought both paternity and a custody determination. Id. at 97. There was no lengthy delay. There was no prior paternity order or other pleading similar to the agreed judgment, which determined that the father was the "noncustodial parent."
¶ 34. In S.B. v. L.W., 793 So.2d 656 (Miss.Ct.App.2001), this Court applied Law in another custody dispute between unmarried parents. Just as in Law, the father petitioned for paternity and custody at the same time. Id. at 657(¶ 1). When the child was born, the father signed the birth certificate. Id. at (¶ 2). For the first five years of the child's life, the father voluntarily paid child support and enjoyed liberal visitation. Id. at (¶ 3). But, "[t]his arrangement was never formalized in court." Id. When the mother expressed a desire to move, the father filed a paternity and custody action. Id. at (¶¶ 1, 6). Since there was never a prior determination of custody, the court cited Law and determined that the chancellor correctly considered the case "as one for initial custody and considered the factors delineated in Albright. . . ." Id. at 659(¶ 13).
¶ 35. What distinguishes S.B. from the present case and C.W.L., is the same as Law. The father in S.B. was not party to a court executed paternity order, i.e., an agreed judgment, that held that he would pay child support. Also, the father in S.B., as in Law, simultaneously challenged custody in the paternity actions.
¶ 36. The effect of this Court's holding, here and in C.W.L., is that we have decided that it is acceptable for the father of an extramarital child to wait over seven years, after he is judicially determined to be the child's father, to ask for custody of his child. This was not the holding in either Law or S.B. Then, after this long wait, this Court has decided that it is then acceptable to apply the Albright factors as if it were an initial determination of custody. I cannot accept that as a proper result or acceptable law to be applied in the future.
¶ 37. After considering C.W.L. and the facts of this case, I am of the opinion that the standard applied in C.W.L. was incorrect. Law looks to whether there was "a prior determination" of custody. It does not require an express determination, nor an explicit ruling on custody. Indeed, an order for child support necessarily rests on a determination that one parent is awarded custody and the other is not.
¶ 38. I am of the opinion that the Agreed Judgment Determining Paternity, executed by the chancellor on May 23, 1997, was a prior determination of custody. Lisa and Ryan were never married and were never divorced. A.F. was born on November 28, 1996. From that date, A.F. *858 remained in the custody of Lisa until the chancellor changed custody. Upon birth, the mother normally retains physical custody of an extramarital child.
¶ 39. Professor Shelton Hand provides this insightful analysis:
The mother of an illegitimate child is entitled to possession and custody of the child, and being the only officially and clearly recognized parent without question, she exercises all of the parental powers. She is entitled to the custody as against the putative father where no showing is made that the mother has abandoned the child or is an unfit person. The fact that the mother should have custody of the child is based upon the strong presumption of the necessity for maternal care of an infant, without regard to the misconduct on the part of the mother. The father of an illegitimate child may, however, render the child legitimate, and such rendition has the effect of establishing the child as a full heir at law of the father. Upon the establishment of the legitimate nature or status of the child, the father then has an equal claim with the mother to the parental and custodial rights to the child. In such a case, the best interest of the child would be the proper criterion for subsequent awards of custody of the child as between the two parents.
Hand, Mississippi Divorce, Alimony & Child Custody § 21-5 (6th ed.2002). In Albright, Justice Prather wrote that the "tender years" doctrine has been weakened but remains a factor for the chancellor to consider in order to determine "the best interest and welfare of the child." Albright, 437 So.2d at 1005.
¶ 40. After A.F.'s birth on November 28, 1996, Lisa apparently sought public financial assistance. As a result, DHS filed the paternity action. Ryan confessed, and he signed the Agreed Judgment Determining Paternity.
¶ 41. DHS was authorized to bring the paternity action pursuant to Mississippi Code Annotated Section 93-9-9(1) (Rev. 2004), which provides:
Paternity may be determined upon the petition of the mother, or father, the child or any public authority chargeable by law with the support of the child;. . . . If paternity has been lawfully determined, or has been acknowledged in writing according to the laws of this state, the liabilities of the noncustodial parent may be enforced in the same or other proceedings by the custodial parent, the child, or any public authority which has furnished or may furnish the reasonable expenses of pregnancy, confinement, education, necessary support and maintenance, and medical or funeral expenses for the custodial parent or the child.
(emphasis added). DHS was a proper party to commence the paternity action because it was a "public authority chargeable by law with the support of the child," and DHS acted on Lisa's behalf. The child support was to be paid to Lisa and was for the benefit A.F.
¶ 42. The first sentence of Section 93-9-9(1) provides who may commence a paternity action. Lisa, Ryan, A.F., or DHS could commence the action to determine who is A.F.'s father and who has the legal responsibility as A.F.'s father. The first sentence of Section 93-9-9(1) provides that DHS was a proper party to initiate a determination of A.F.'s paternity. Thus, after the agreed judgment was entered on May 23, 1997, Ryan legally was the father of A.F.
¶ 43. The second sentence of Section 93-9-9(1) provides the statutory authority for the chancellor to enforce the certain obligations of that legal relationship. Id. *859 One obligation of a father is to provide for his child's financial needs. The statutory language also contemplates that someone must be determined to have physical custody of the child. The second sentence required that the chancellor consider who has actual physical custody of the child, for that is the person who will receive the benefit of the ordered child support. Id. The statute clearly and unambiguously differentiates between the "custodial parent" and the "noncustodial parent." Id.
¶ 44. By his execution of the agreed judgment, Ryan agreed that (1) he was A.F.'s father, (2) he was not A.F.'s custodial parent, and (3) he was responsible for child support, i.e., the "liabilities of the noncustodial parent." Stated differently, there were three findings in the Agreed Judgment. Two were expressly stated, and one was implied. The agreed judgment expressly found that Ryan was A.F.'s father and was obligated to pay child support. The agreed judgment also implicitly found that Ryan was the "noncustodial parent." Child custody was not decided by the chancellor, but Ryan certainly agreed that he was not the custodial parent when he agreed, and the court ordered, that he would pay child support. If Ryan disagreed with these findings, Ryan should have promptly taken action to change the second and third findings. Indeed, he did so when he filed his petition for custody on September 21, 2004.
¶ 45. Not every case requires the chancellor to undertake an on-the-record analysis of the Albright factors before custody is determined. For example, in an irreconcilable differences divorce, the parties may "provide by written agreement for the custody and maintenance of any children of that marriage." Miss.Code Ann. § 93-5-2(2) (Rev.2004). Where the parties agree to custody, the statute does not require the chancellor to analyze the Albright factors or make an on the record analysis. Instead, Section 93-5-2(2) authorizes the chancellor to accept that the parties have, through their agreement, determined that it is in the best interest of the child(ren) to be in the custody of a certain parent. The parties determination of custody in an irreconcilable differences divorce is sufficient for the chancellor to apply the modification standard in any subsequent request for change of custody.
¶ 46. The Albright factors are for the chancellor to consider when custody is challenged and the chancellor must decide who is to have custody. Albright, 437 So.2d at 1005. There is simply no legal authority that requires the chancellor to employ the Albright factors where there is no challenge to custody.
¶ 47. Immediately upon the execution of the May 23, 1997 agreed judgment, Ryan had an "equal" right to the custody of A.F. Mississippi Code Annotated section 93-13-1 (Rev.1994) provides:
The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates. The father and mother shall have equal powers and rights, and neither parent has any right paramount to the right of the other concerning the custody of the minor or the control of the services or the earnings of such minor, or any other matter affecting the minor.
¶ 48. On May 23, 1997, six months after A.F.'s birth, Ryan had the right to petition the court for custody of A.F. If Ryan had done so, he would have certainly been entitled to the original determination standard. Indeed, Ryan would have been in the same position as the fathers in Law or C.W.L. The chancellor would have been required to analyze the Albright factors *860 and determine which parent, Ryan or Lisa, should have custody of A.F.
¶ 49. Instead, with the agreed judgment in place, Ryan allowed A.F. to remain in Lisa's custody for over seven years. From November 28, 1996 until the chancellor's judgment on April 20, 2005, the first eight-and-a-half years of A.F.'s life, she lived with Lisa, and Ryan paid child support every month. For approximately 102 months, Ryan paid his child support and acknowledged that Lisa had custody of A.F. Ryan waited until A.F. was seven-years old before he even requested custody.
¶ 50. In Fletcher v. Shaw, 800 So.2d 1212, 1215(¶ 8) (Miss.Ct.App.2001), this Court held that where parties enter a court approved custody agreement, the modification standard applies to subsequent custody disputes. Fletcher gave birth to a daughter on June 19, 1991. Id. at 1214(¶ 2). She and the father Shaw were never married. Id. Two years later, Fletcher and Shaw entered a custody and child support agreement that was approved by the court. Id. at (¶ 3). It was agreed that Fletcher was to retain custody. Id. In 1999, Shaw sued for custody. Id. at (¶ 4). Because there was a court-approved contract establishing custody, we applied the modification standard to Shaw's 1999 claim. Id. at 1215(¶ 8).
¶ 51. Fletcher is instructive here. Ryan's execution of the agreed judgment in the initial paternity suit is a court sanctioned agreement that Lisa be granted custody. By doing so, Ryan confessed that it was in the best interest of A.F. to remain in Lisa's custody. Therefore, I am of the opinion that Ryan has waived the Albright analysis and must show a material change in circumstances sufficient to change custody, which has remained unchallenged for these many years.
¶ 52. I am reluctant to overrule a recent prior decision of this Court. However, I am of the opinion that it is more important to establish a proper evidentiary standard that will protect extramarital children. Thus, when a child is born out of wedlock, the paternity action initiates the parental responsibilities of the child's natural father. The court, as here, decides that the man is the child's biological father, and he must provide support for the child. I am of the opinion that it was unreasonable for the chancellor to allow Ryan to wait over seven years to seek custody and to then use the initial custody standard as opposed to the modification of custody standard.
¶ 53. I see this as no different than Fletcher or an irreconcilable difference divorce, where the parties agree as to who is granted custody. In such case, upon a subsequent request for a change of custody, the chancellor does not simply conduct an Albright analysis. Instead, the motion to change custody is based on the modification of custody standard.
¶ 54. We should also consider the maxim that "equity aids the vigilant, not those who slumber on their rights." In Osborne v. Vince, 240 Miss. 807, 813, 129 So.2d 345, 348 (1961), the court held:
It is a well-established maxim that equity aids the vigilant, not those who slumber on their rights. 1 Pomeroy's Equity Jurisprudence (4th Ed.1918), Section 363, p. 674. Judge Griffith, discussing this maxim in Section 41 of his cited treatise, says: "Those who are diligent find equity always ready to extend just aid, but the slothful are not favored. There is no principle of equity sounder or more conservative of peace and of fair play than this, which requires a party who has a claim to prefer or a right to assert to do so with a conscientious promptness while the witnesses to the *861 transaction are yet available and before the facts shall have faded from their memories. It is a fact of universal experience that men will generally use diligence to get what rightfully belongs to them, and will unreasonably delay only as to false or inequitable claims,  thus in the hope that fortuitous circumstances may improve their otherwise doubtful chances. If therefore a party delay the bringing of his suit, or delay the taking of some particular step therein, to such an unreasonable time that to allow him so late to proceed would work an injustice and injury upon the opposite party, it will require a much stronger case to move the court to action than if the matter had been seasonably presented; and if on account of the delay a serious injustice would result to the opposite party the court may decline to proceed at all."
¶ 55. Here, the agreed judgment in the paternity action began Ryan's rights as A.F.'s father. Ryan became obligated to support the child he brought in to this world. Under our legal structure, I am of the opinion that it was incumbent upon Ryan to seek custody at the time his legal relationship is established, or within a reasonable time thereafter, to avail himself of the initial determination of custody through the chancellor's application of the Albright factors. I believe it is an injustice that the law would allow Ryan to wait almost eight years, while Lisa fulfilled the duties as A.F.'s custodial parent, and then seek the "initial determination of custody under Albright." I am of the opinion that Ryan's wait of over seven years to challenge custody required that the chancellor consider Ryan's petition for custody under the modification of custody standard instead of the initial determination of custody standard.
¶ 56. I would reverse and remand for the chancellor to treat this as a request for modification, and "the chancellor's duty is to determine if there has been a material change in the circumstances since the award of initial custody which has adversely affected the child and which, in the best interest of the child, requires a change in custody." Sanford v. Arinder, 800 So.2d 1267, 1271(¶ 15) (Miss.Ct.App.2001). As such, the non-custodial parent must pass a three-part test: "a substantial change in circumstances of the custodial parent since the original custody decree, the substantial change's adverse impact on the welfare of the child, and the necessity of the custody modification for the best interest of the child." Id. at 1272(¶ 15) (quoting Brawley v. Brawley, 734 So.2d 237, 241(¶ 12) (Miss.Ct.App.1999)) (emphasis added).
¶ 57. For these reasons, I respectfully dissent.
SOUTHWICK and CHANDLER, JJ., join this separate opinion.
NOTES
[1] The case was styled "Department of Human Services, State of Mississippi ("DHS") v. William R. Fulgham," in the Lafayette County Chancery Court, Civil Action No. 97-036.
[2] Indeed, Uniform Chancery Court Rule 4.03 provides that "[w]hile the Chancellor is rendering an oral opinion in any action he shall not be interrupted by anyone. After he has concluded, counsel for either party may make such suggestions or request such further findings of law or fact as may be deemed proper."